# RAICHLE v. FEDERAL RESERVE BANK OF NEW YORK.

Circuit Court of Appeals, Second Circuit.
July 15, 1929.

No. 354.

Frank G. Raichle, of Buffalo, N. Y. (Rob-
ert L. Owen, of Washington, D. C., and Car-

los C. Alden and Ethan W. Judd, both of Buffalo, N. Y., of counsel), for appellant.

Newton D. Baker, of Cleveland, Ohio, and Walter S. Logan, of New York City, for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge (after stating the facts as above). The wrongs charged against the bank are (a) spreading propaganda concerning an alleged money shortage and increasing volume of collateral loans; (b) setting about to restrict the supply of credit available for investment purposes by engaging in open market transactions through the sale of its securities; (c) raising the rediscount rate for its member banks in order to reduce the volume of security loans; (d) coercing member banks to call collateral loans by declining to rediscount eligible commercial paper for such member banks.

Three principal questions must be considered:

(1) Are the foregoing acts, irrespective of the alleged purpose to reduce the volume of brokers' loans, within the power of the Federal Reserve Bank?

(2) If the acts are, generally speaking, lawful, are they rendered unlawful because the purpose was to reduce the volume of brokers' loans?

(3) Is the Federal Reserve Board a necessary party to the action?

The Federal Reserve Act (12 USCA § 221 et seq.) marked the end of a long struggle and was thought to afford the solution of many difficulties. When the Independent Treasury Bill (9 Stat. 59) was passed in 1846, the effect was completely to divorce the government from all connection with the money market, by making it its own banker and by keeping government funds in the vaults of independent treasury office banks. The public then had to depend on state banks for currency and credit, with a result that in times of financial stress is well known.

To meet the necessities of the Civil War, national banks were established. They became the official depositaries of the government and furnished an enlarged currency, because of their ability to issue circulating notes against government bonds deposited with the Treasurer of the United States. They were required to maintain reserves in certain cities, based upon a percentage of their deposits. As the government debts of the Civil War became liquidated, the means for issuing currency lessened, though the business requirements of the country were expanding. In such a situation business prosperity inevitably promoted monetary stringency. Moreover, as the reserves were deposited in relatively few banks in the metropolitan centers, when financial stringencies arose, pressure always came on the banks, their deposits would be withdrawn, the rates for call loans would advance, and a liquidation of collateral and depreciation of values would ensue.

While the national banking system was a great improvement over what went before, it provided no central regulating force, and furnished no adequate means for controlling interest rates, or preventing or lessening financial stringencies and panics. The usual method of furnishing funds needed for business was for the Treasury to deposit moneys from its vaults in the national banks and to withdraw these deposits, if they were used too much in speculation. This was a rather ineffectual way of dealing with complicated and difficult situations. It was dependent too much upon the determination of a single official and lacked the information and guidance that a scientific federal banking system would afford.

To remedy the difficulties we have mentioned, the Federal Reserve Act was passed. The Federal Reserve Banks have national charters and their stockholders are member banks. Each Federal Reserve Bank has nine directors, three chosen from the member banks, three selected as representatives from industry, and three designated by the Federal Reserve Board—a central body consisting of the Secretary of the Treasury, the Comptroller of the Currency, and six other members appointed by the President with the consent of the Senate. This board is given, by law, the power to exercise general supervision over Federal Reserve Banks. It is in terms empowered to examine the affairs of each Federal Reserve Bank and to publish weekly a statement showing the condition of each bank, as well as a consolidated statement of all the banks in the system. It is also specifically empowered to permit, or in certain cases to require, Federal Reserve Banks to rediscount the discounted paper of other reserve banks, and to suspend, for a limited time, reserve requirements, and it is empowered to review and determine rates of discount to be charged by Federal Reserve Banks "which shall be fixed with a view of accommodating commerce and business."

Furthermore a Federal Advisory Council is created by the act, with a delegate member from each Federal Reserve Bank. This

council is authorized to confer with the Federal Reserve Board on general business conditions, to make oral or written representations concerning matters within the jurisdiction of the board, and to call for information and to make recommendations in regard to discount rates, rediscount business, note issues, reserve conditions in the various districts, the purchase and sale of gold and securities by reserve banks, open market operations by those banks, and the general affairs of the Reserve Banking System.

The foregoing outline shows the broad purposes of the Act and the wide powers of supervision and control given to the Federal Reserve Board over the whole Reserve System. The congressional report of Senator Glass stated the objects of the act as follows:

"(1) Establishment of a more nearly uniform rate of discount throughout the United States, and thereby the furnishing of a certain kind of preventive against overexpansion of credit which should be similar in all parts of the country.

"(2) General economy of reserves, in order that such reserves might be held ready for use in protecting the banks of any section of the country, and for enabling them to go on meeting their obligations, instead of suspending payments, as so often in the past.

"(3) Furnishing of an elastic currency by the abolition of the existing bond-secured note issue in whole or in part, and the substitution of a freely issued and adequately protected system of bank notes, which should be available to all institutions which had the proper class of paper for presentation.

"(4) Management and commercial use of the funds of the government which are now isolated in the Treasury and subtreasuries in large amounts.

"(5) General supervision of the banking business and furnishing of stringent and careful oversight.

"(6) Creation of market for commercial paper."

To carry out the purposes of the act, Federal Reserve Banks, subject to the supervision of the Federal Reserve Board, are authorized to act as government depositaries and fiscal agents; to receive and maintain the legal reserves of member banks; upon endorsement of member banks to discount notes, drafts, and bills of exchange arising out of actual commercial transactions, but not "notes, drafts, or bills covering merely investments, or issued for the purposes of carrying or trading in stocks, bonds, or other investment securities, except bonds and notes

of the government of the United States"; to make advances to member banks on their promissory notes for not more than 15 days at rates to be established by the Federal Reserve Banks, subject to the review and determination of the Federal Reserve Board, provided such promissory notes are secured by eligible paper, or by bonds, or notes of the United States, to receive Federal Reserve notes upon deposit of eligible paper, or gold, or gold certificates, provided a gold reserve of not less than 40 per cent. of such notes is maintained. USCA tit. 12, c. 3, §§ 341–361.

Federal Reserve Banks may also, under rules and regulations prescribed by the Federal Reserve Board, engage in "open market operations"; that is to say, purchase and sell in the open market at home or abroad cable transfers and bankers' acceptances and bills of exchange of the kinds and maturities eligible for rediscount. They may deal in gold coin and bullion at home and abroad; buy and sell, at home and abroad, bonds and notes of the United States, and bills, notes, revenue bonds, and warrants with a maturity from date of purchase of not exceeding six months, issued by any state, county, district, political subdivision, or municipality in the United States, such purchases to be made in accordance with regulations prescribed by the Federal Reserve Board. They may purchase from member banks, and sell, bills of exchange arising out of commercial transactions, and may "establish from time to time, subject to review and determination by the Federal Reserve Board, rates of discount to be charged by the Federal Reserve Bank for each class of paper, which shall be fixed with a view of accommodating commerce and business." They may establish accounts with other Federal Reserve Banks, with the consent and upon the order and direction of the Federal Reserve Board, and, under regulations to be prescribed by said board, may open accounts and establish agencies in foreign countries for the purpose of purchasing, selling, and collecting bills of exchange. They may purchase and sell in the open market, either from or to domestic banks, firms, corporations, or individuals, acceptances of Federal Intermediate Credit Banks and of national agricultural credit corporations whenever the Federal Reserve Board shall declare that the public interest so requires. USCA tit. 12, c. 3, §§ 353–357.

The foregoing provisions enable the Federal Reserve Banks, without waiting for applications from their member banks for loans or rediscounts, to adjust the general credit

situation by purchasing and selling in the open market the class of securities that they are permitted to deal in. The power "to establish from time to time, subject to review and determination of the Federal Reserve Board, rates of discount to be charged by the Federal Reserve Bank," appears in the act (12 USCA § 357) with the open market powers. The two powers are correlative and enable the Federal Reserve Banks to make their rediscount rates effective. The sale of securities does not lessen the total amount of credit available, but, by necessitating payment to the Federal Reserve Banks, increases available credit in their hands, "with a view of accommodating commerce and business," as provided by the act. USCA tit. 12, c. 3, § 357.

Such being an outline of the powers of the Federal Reserve Board, the Federal Advisory Council, and the Federal Reserve Bank, it is necessary to consider whether any of the acts which the bill says were performed by the Federal Reserve Bank of New York were in themselves, irrespective of a purpose to reduce the volume of brokers' loans, unlawful.

■■■ Certainly it was lawful to engage in open market transactions by the sale of securities, to fix the rediscount rate, and to decline to rediscount eligible paper. Purchases and sales in the open market are specifically authorized by the act. USCA tit. 12, c. 3, §§ 353–356. Likewise the act (12 USCA § 357) in terms empowers "every Federal Reserve Bank * * * to establish from time to time, subject to review and determination of the Federal Reserve Board, rates of discount to be charged by the Federal Reserve Bank for each class of paper, which shall be fixed with a view of accommodating commerce and business." While it is alleged in the bill that the rediscount rate "has been arbitrarily and unreasonably raised," it was for the defendant, subject to the supervision of the Federal Reserve Board, to determine what would be a reasonable rediscount. It is not contended that the provision for fixing rates of discount is unconstitutional, nor would it seem even reasonable to argue that it is, after such decisions as First National Bank v. Fellows ex rel. Union Trust Co., 244 U. S. 416, 37 S. Ct. 734, 61 L. Ed. 1233, L. R. A. 1918C, 283, Ann. Cas. 1918E, 1169, and Westfall v. United States, 274 U. S. 256, 47 S. Ct. 629, 71 L. Ed. 1036 as well as the Legal Tender Cases, 110 U. S. 421, 4 S. Ct. 122, 28 L. Ed. 204, Farmers' and Mechanics' National Bank v. Dearing, 91 U. S. 29, 23 L. Ed. 196, and McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579.

The act being constitutional, we are asked to hold that the bank may not sell its own securities and fix the rates at which it will discount or rediscount paper, when it is given the power by the specific terms of the Federal Reserve Act to do all of these things. It is important to note that it is not under any compulsion to rediscount eligible paper, for the words of the act in respect to rediscounting are wholly permissive. The act provides that: "Any Federal Reserve Bank may, subject to regulations and limitations to be prescribed by the Federal Reserve Board, discount notes, drafts, and bills of exchange. * * *" USCA tit. 12, c. 3, § 348.

But it is alleged that the bank and the Federal Reserve System generally have wrongfully "spread propaganda concerning an alleged money shortage and expressed alarm over the increasing volume of collateral loans, whereas no shortage exists other than one of their own making, which is technical in its nature and artificial in its essence."

As we have already said, the act requires the Federal Reserve Board to examine the books and affairs of each Federal Reserve Bank, to require such statements as it may deem necessary, and to publish each week a statement showing the condition of each bank and a consolidated statement for all the banks. These statements shall show in detail the assets and liabilities, and shall furnish full information regarding the character of the money held as reserve, and the amount, nature, and maturities of the paper and other investments held. The Federal Advisory Council shall also have power to confer with the Federal Reserve Board on general business conditions, make oral or written representations concerning matters within the jurisdiction of the board, and call for information and make recommendations as to discount rates, rediscount business, reserve conditions, the purchase and sale of gold or securities by reserve banks, open market operations, and the general affairs of the Reserve Banking System.

■ In view of such provisions for detailed reports on the condition of the banks and for intercommunication between the board and the council regarding the general affairs of the Reserve Banking System, we think it most unlikely that statements as to the condition of affairs cannot be made public by the board, the council, and the banks. The provisions for reports, representations, and recommendations seem to imply *public information* and, when the situation warrants it, public warning. What particular conditions may warrant is necessarily left to those clothed with responsibility for acting. Warn-

ing before taking action would seem to be a safer practice than sudden and perhaps drastic action without warning. Plaintiff's assertion that the banks have spread *false* propaganda regarding a money shortage is inaccurate. It apparently is based on the allegation of the bill that "no shortage exists other than one of their own making, which is technical in its nature and artificial in its essence." This is an argumentative and obscure allegation of no value in a pleading. If it means that the Federal Reserve Banks exercised their right to sell in the open market and refused to rediscount eligible paper, it should have said so; but, if such were the fact, the banks would still have been within their rights and the plaintiff would have gained nothing by the allegation. We therefore deem the charge of spreading propaganda without legal significance.

But the plaintiff chiefly relies on his charge that the defendant has engaged in "a course of conduct * * * which has had for its object and purpose an arbitrary reduction in the volume of collateral or brokers' loans." It is nowhere said that the bank has acted in bad faith or has *aimed* to injure the plaintiff. But it seems to be thought that it may be said that the acts of the bank were likely to cause damage to the plaintiff —in fact, caused such damage—and therefore gave rise to a cause of action, unless some legal justification can be shown.

This general theory of liability was suggested by Justice Holmes in an article entitled "Privilege Malice and Intent," published in volume 8 of the Harvard Law Review, as long ago as 1894. At the time, it was regarded as a somewhat startling generalization by a profession which had viewed all liabilities in tort under the categories of forms of action. But, while courts have differed as to when justification exists, the above generalization of Justice Holmes, reiterated in 18 Harvard Law Review by Professor Ames, has been more and more used as a convenient means of approaching problems in torts. Aikens v. Wisconsin, 195 U. S. at page 204, 25 S. Ct. 3, 49 L. Ed. 154. In many cases, such as libel and slander and malicious prosecution, a malevolent motive destroys the privilege, while in cases affecting the use of land the privilege has frequently been held absolute. No hard and fast rule can be laid down as to when the privilege exists. Indeed, it was said in Aikens v. Wisconsin, supra, that what will be considered a justification depends upon "principles of policy." See, also, Green v. Victor Talking Mach. Co. (C. C. A.) 24 F.(2d) 378, 59 A. L. R. 1091. The plaintiff has seized upon the opinion of Justice Holmes in American Bank & Trust Co. v. Federal Bank, 256 U. S. 350, 41 S. Ct. 499, 65 L. Ed. 983, to support his contention that a purpose to reduce the volume of brokers' loans destroys the plaintiff's ordinary right to sell its own securities, fix the rates for extending credit, and warn the public against inflation. But there a Federal Reserve Bank was charged with accumulating checks of country banks and presenting them in large quantities, in order to compel these banks to become members of the Reserve Bank, or, at least, to open a nonmember clearing account with it. In such circumstances Justice Holmes said that the "United States did not intend by * * * statute to sanction this sort of warfare." In the case at bar the "principles of policy" point the other way. It would be an unthinkable burden upon any banking system if its open market sales and discount rates were to be subject to judicial review. Indeed, the correction of discount rates by judicial decree seems almost grotesque, when we remember that conditions in the money market often change from hour to hour, and the disease would ordinarily be over long before a judicial diagnosis could be made.

Nor is the plaintiff aided by his charge that the defendant has wrongfully controlled member banks, by coercing them to call collateral loans made to their customers, for the only method of coercion suggested is the refusal to rediscount eligible commercial paper. Such a refusal was not a wrong, because no provision of the act *requires* the bank to discount unless so ordered by the board.

We can see no basis for the contention that it is a tort for a Federal Reserve Bank to sell its securities in the open market, to fix discount rates which are unreasonably high, or to refuse to discount eligible paper, even though its policy may be mistaken and its judgment bad. The remedy sought would make the courts, rather than the Federal Reserve Board, the supervisors of the Federal Reserve System, and would involve a cure worse than the malady. The bank, under the supervision of the board, must determine whether there is danger of financial stringency and whether the credit available for "commerce and business" is sufficient or insufficient. If it proceeds in good faith through open market operations and control of discount rates to bring about a reduction of brokers' loans, it commits no legal wrong. A reduction of brokers' loans may best accommodate "commerce and business." USCA tit. 12, c. 3, § 357.

Defendant's counsel have made a persuasive argument that upon the facts alleged the questions raised are political, and not justiciable. We have not discussed it, because without it the defendant's position seems to be unassailable.

■ It is contended that the bill must in any event be dismissed because of the failure to join the members of the Federal Reserve Board as parties. The "defendant and the Federal Reserve System generally" are charged with spreading propaganda. The Federal Reserve System must include the board. The board by the act is given power to exercise general supervision over Federal Reserve Banks. USCA tit. 12, c. 3, §-248 (j).

It is specifically empowered to regulate open market transactions, to review and determine rates of discount, and to make reports as to conditions in the Federal Reserve System. In such circumstances, the bank is, as to the matters complained of here, a governmental agency under the direction of the Federal Reserve Board. If the plaintiff prevailed in his contention, the bank would be enjoined from fixing a discount rate which the board had presumptively directed. Such a situation under familiar principles renders the Federal Reserve Board an indispensable party to the suit. Alcohol Warehouse Corp. v. Canfield (C. C. A.) 11 F.(2d) 214.

But the plaintiff contends that such cases as Gnerich v. Rutter, 265 U. S. 388, 44 S. Ct. 532, 68 L. Ed. 1068, and Webster v. Fall, 266 U. S. 507, 45 S. Ct. 148, 69 L. Ed. 411, differ from the present, because the Federal Reserve Banks are independent units and in that respect differ from agents like the prohibition director, who is created under a regulation of the Department of Internal Revenue and is subject to the orders of the commissioner. Moreover, the plaintiff calls attention to the fact that in American Bank & Trust Co. v. Federal Reserve Bank, 256 U. S. 350, 41 S. Ct. 499, 65 L. Ed. 983, the Supreme Court maintained jurisdiction without suggesting that the Federal Reserve Board was a necessary party, although the bill there alleged that the wrongs done by the bank were done in pursuance of a policy "accepted by the Federal Reserve Board." But in American Bank & Trust Co. v. Federal Reserve Bank, supra, the point that the Federal Reserve Board was an indispensable party was not raised, so that we must regard Gnerich v. Rutter and Webster v. Fall, supra, as controlling. In the last case the argument was made that in other suits, brought against subordinate officials without joining the superior, the court had proceeded to determine the merits, but Justice Sutherland said that "questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."

We have discussed the merits in case our decision should be reviewed, and our opinion that the Federal Reserve Board is a necessary party should be thought erroneous.

The decree is modified, so as to dismiss the bill because of failure to join the members of the Federal Reserve Board, who are indispensable parties, and, as so modified, is affirmed.