559 F.2d 863
 HUNTINGTON TOWERS, LTD. and Richard Carey, Plaintiffs-Appellants,
v.
FRANKLIN NATIONAL BANK (in liquidation) and Federal Deposit
Insurance Corporation, Defendants,
Federal Reserve Bank of New York, European-American Bank,
and James Smith, Individually and as Comptroller
of the Currency, Defendants-Appellees.
 No. 521, Docket 76-6109.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 17, 1977.
Decided July 19, 1977.
 
 Donald E. Sheil, New York City, for plaintiffs-appellants.
 William E. Hegarty, New York City (Cahill Gordon & Reindel, Allen S. Joslyn, and Michael P. Tierney, New York City, on the brief), for defendant-appellee Federal Reserve Bank of New York.
 Philip K. Howard, New York City (Sullivan & Cromwell and John L. Warden, New York City, on the brief), for defendant-appellee European-American Bank & Trust Co.
 J. Christopher Jensen (David G. Trager, U.S. Atty., Eastern District of New York, Bernard J. Fried, and Lewis F. Tesser, Asst. U.S. Attys., Eastern District of New York, Brooklyn, N.Y., on the brief), for defendant-appellee James Smith.
 Barrett Smith Schapiro & Simon, Michael O. Finkelstein, and Lawrence J. Zweifach, New York City, on the brief of Sol Neil Corbin, Trustee in Bankruptcy of Franklin New York Corp., as amicus curiae.
 Before ANDERSON and TIMBERS, Circuit Judges, and KNAPP, District Judge.*
 ROBERT P. ANDERSON, Circuit Judge:
 
 
 1
 This is an appeal by Huntington Towers, Ltd. and Richard Carey from an order of the United States District Court, Eastern District of New York, dismissing a complaint for monetary and equitable relief against the Federal Reserve Bank of New York (FRB), and James E. Smith, individually and in his former capacity as Comptroller of the Currency (the Comptroller), as well as against European-American Bank (EAB). The complaint had also alleged claims against Franklin National Bank (in liquidation)B and the Federal Deposit Insurance Corp. (FDIC). The district court's disposition of these last claims, however, are not before us inasmuch as the appeals of both FNB and FDIC have been withdrawn without prejudice. We affirm the order as it relates to the Federal Reserve Bank and to James E. Smith, individually and in his former capacity as Comptroller of the Currency, and affirm it in part and reverse it in part as it relates to European-American Bank.
 
 
 2
 This action resulting from the largest bank failure in United States history, the financial collapse of Franklin National Bank, which was declared insolvent by the Comptroller of the Currency on October 8, 1974, pursuant to his authority under 12 U.S.C. § 191. It had been in serious trouble sometime before October 8th; large scale foreign exchange speculations, in addition to extensive loans, the collectibility of which was in doubt, had precipitated a liquidity crisis and drawn the active attention of federal regulatory officials. The Comptroller, aware of FNB's problems, had endorsed efforts in the spring of 1974 to merge FNB with a healthier institution in order to avoid insolvency. The Federal Reserve Bank of New York provided over $1.7 billion in emergency credit during this critical period, which enabled FNB to maintain banking operations. See generally, H.Rep. No. 94-1669 (Adequacy of the Office of the Comptroller of the Currency's Supervision of Franklin National Bank ), 94th Cong., 2d Sess. (1976). While the Comptroller was unsuccessful in his merger efforts, he was able to invite bids from at least four qualified banking institutions for the sale of part of the assets of FNB. The Comptroller declared FNB insolvent and appointed FDIC as receiver simultaneously. An agreement between European-American Bank, the buyer of a sizeable portion of FNB's assets, and FDIC, as the appointed Receiver of FNB, was entered into at 3 P.M. on October 8, 1974. The Purchase and Assumption Agreement was approved ex parte in the Eastern District of New York on the same date, In re Franklin National Bank, 381 F.Supp. 1390 (E.D.N.Y.1974).
 
 
 3
 In the midst of this feverish activity, plaintiff Huntington Towers, a New York corporation owned by the individual plaintiff Richard Carey, was an FNB borrower. In 1973, Huntington was the owner and developer of a tract of real estate near New York's Long Island Expressway, on which one office building had been erected and another was soon to be constructed. The financing for the second office building was arranged with FNB in November of 1973. FNB committed itself to loan up to five million dollars on the conditions that a responsible lending institution would take a permanent mortgage on the completed building, and that Huntington and Carey would obtain a major tenant for the building. FNB continued to advance funds for the construction of "Huntington Towers II" until October 8, 1974, when FNB was declared insolvent by the Comptroller and the FDIC was appointed Receiver. Thereafter, no additional funding was extended to Huntington, with the exception of a $100,000 advance by EAB after its acquisition of a large part of the assets of FNB. Consequently further construction of the building ceased. Huntington thereafter could not secure financing from other sources, and it defaulted on a number of secured obligations. It was also faced with foreclosures on other properties which it owned. This action followed.
 
 
 4
 Huntington and Carey's complaint alleged first that, beginning on and after May 15, 1974 (approximately five months before the Comptroller's official announcement of October 8), the Comptroller, FRB and FDIC knew of FNB's insolvency and entered into an "illegal and improper" plan to conceal it. While this plan to "cover up" was ongoing, Huntington and Carey allegedly gave FNB additional security, said to have a value in excess of $3,000,000, for monies advanced and to be advanced under FNB's loan commitment to the plaintiffs. Once FNB was declared insolvent by the Comptroller, plaintiffs charged that they were assured of continued financing by EAB, FNB and FDIC, which was not forthcoming except for the $100,000 advance by EAB. These events allegedly resulted in damage to the plaintiffs of $8,000,000.
 
 
 5
 Plaintiffs' second cause of action stemmed from the October 8, 1974 Purchase and Assumption Agreement between FDIC, as Receiver, and EAB which provided that FDIC would sell to EAB certain FNB assets to be selected by EAB and to be paid for by an amount equal to FNB's deposit liabilities at the time of the receivership, minus the amount of a premium to be paid by EAB. The remaining assets of FNB would be retained by FDIC, as Receiver, and applied first, to meet FNB's outstanding obligations to FRB for the emergency credit advanced prior to insolvency, and second, to the stockholders of FNB. In re Franklin National Bank, supra, 381 F.Supp. at 1391-92. The provisions of the sale agreement were approved by the United States District Judge, as noted above, in an ex parte judicial proceeding which thereby enabled FNB to open its doors for business under its new owner, EAB, on the day following the insolvency. Plaintiffs in the instant action challenged the provisions of the sale as "contrary to law and . . . a fraud on the general creditors of Franklin National, and in particular, a fraud on innocent persons dealing with Franklin National after it became insolvent and while its insolvency was being concealed by the defendants." Plaintiffs' status as claimants was said to derive from the retention by FNB of the $3,000,000 in collateral, which secured FNB advances to Huntington.
 
 
 6
 In taking up the FRB's motion to dismiss, the district court treated the motion as one for summary judgment under F.R.Civ.Pro. 56 "(i)n the light of documentation on other motions concerning the facts leading up to the receivership of Franklin." That documentation included a letter, dated May 10, 1974, from the Acting Comptroller to the FRB asserting that at the time of the Comptroller's examination of FNB on March 8, 1974, the Bank was found to have "severe credit and liquidity problems, but was adjudged to be solvent." On May 12, 1974, the FRB issued a press release announcing its willingness to extend credit to FNB on the basis of "a large amount of acceptable collateral available to support advances . . . , if they are needed." FRB then advanced more than one billion dollars to FNB on demand notes. Characterizing plaintiffs' first cause of action as "based on tort liability for failure to disclose the alleged known insolvency of Franklin," the district court ruled that such a claim was barred under the Federal Tort Claims Act, 28 U.S.C. § 2680(h).
 
 
 7
 As to plaintiffs' second cause of action, arising out of the October 8, 1974 Purchase and Assumption Agreement disposing of FNB's assets, the court ruled that it was "not appropriate to press the claim against FRB," inasmuch as under the agreement, FRB had released its lien to EAB with respect to FNB assets purchased by EAB, and to FDIC, as a corporation, with respect to the remaining assets. FDIC had, in turn, assumed and agreed to pay the entire FRB indebtedness with interest. As a result of these transactions, the court found that FRB was not a necessary party to the litigation. Further, plaintiffs' reliance on 12 U.S.C. § 91, which renders void certain transfers of the assets of a national bank, was found inapplicable to the actions of the FRB. The court took notice of FRB's reference to the general rule that a "pledge of collateral for new money does not constitute a preference(,) Lucas v. Federal Reserve Bank, 59 F.2d 617, 621 (4th Cir. 1932)" and the fact that the FRB, under Regulation A, 12 C.F.R. 201.2, was authorized to extend emergency credit to member banks in "exceptional circumstances." As a matter of policy, the court below felt that the ability of Federal Reserve Banks
 
 
 8
 "(t)o serve their function may be inhibited if loans to a national bank suffering liquidity problems are subject to reexamination after the event, on the basis of court determination of insolvency or the likelihood of insolvency at the time emergency action was taken."
 
 
 9
 The claims against the Comptroller individually and in his official capacity, were dismissed likewise on sovereign immunity grounds pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), (h). The district court noted that the Comptroller had worked for several months prior to October 8, 1974 on plans for a long-term solution to FNB's problems. The Comptroller had declared FNB insolvent after FDIC had worked out a plan to assure the continuance of FNB banking services and after the FRB had informed him on October 7, 1974 that continued emergency credit to FNB would not be in the public interest.
 
 
 10
 The claims against EAB stemmed from its failure to assume the Huntington financing. The circumstances surrounding this claim were that, after the declaration of insolvency, EAB had advanced $100,000 in behalf of Huntington to Ikenson Iron Works, Inc., a subcontractor for the steel framework of Huntington's building. In connection with this advance, a Mr. Rilke, Vice President of EAB in charge of the transaction, asserted that he gave no assurances that financing would continue. To the contrary was the affidavit of Mr. Ikenson of Ikenson Iron Works, who asserted that Mr. Klaus Jacobs of EAB told him when the $100,000 EAB check was issued that "(w)e intend to finance construction of the job because we have a commitment to Long Island . . . ." Faced with the above and other conflicting assertions, the district court took into account plaintiffs' concession that there was no agreement in writing binding EAB, and also the parties' agreement that advances under a mortgage are subject to the N.Y. Statute of Frauds, New York General Obligations Law (N.Y.G.O.L.) § 5-703(1). Accordingly, the court held,
 
 
 11
 "Even if the alleged statements of EAB officers about continuing the financing of the building were sufficiently firm and definite to constitute an agreement, the advance of $100,000 by EAB would not be an equitable reason for avoiding the statute of frauds."
 
 
 12
 Plaintiffs had also argued that even if the purported Huntington-EAB agreement was subject to the Statute of Frauds, the equitable doctrine of part performance, N.Y.G.O.L. § 5-703(4), applied in this case to make the oral contract enforcible. The alleged part performance here was the $100,000 EAB check to Ikenson Iron Works, Inc. on behalf of Huntington. This contention also failed, because the district court decided that New York law requires the alleged apart performance to be "unequivocally referable" to the oral agreement, Gracie Square Realty Corp. v. Choice Realty Corp., 305 N.Y. 271, 279-80, 113 N.E.2d 416 (1953). The district court found that the $100,000 EAB advance "was merely an expensive way of keeping plaintiffs in operation until EAB could determine whether it was willing to assume a building loan agreement with plaintiffs." The October 8, 1974 agreement explicitly provided that any advance to an FNB customer by EAB, if made within 180 days after FNB's closing, did not prevent EAB from thereafter rejecting the loan.
 
 
 13
 As to plaintiffs claim of a fraudulent transfer by which the FRB allegedly acquired an illegal priority over former FNB assets retained by FDIC as Receiver, through the October 8, 1974 agreement, the district court ruled that EAB was entitled to the protection of a bona fide purchaser, primarily because EAB had submitted a competitive bid for the FNB assets it subsequently acquired, including a $125 million premium over the book value of those assets. Accordingly, the court ruled that "EAB cannot be charged with any fraud which impairs its title to assets which it acquired."
 
 
 14
 The gist of appellants' first claim against the FRB is that the large credit extension afforded FNB from May through early October, 1974, should not have been made available in light of FNB's hopeless financial situation throughout that period and that failure to disclose the insolvency to appellants constituted an actionable tort. As mentioned by the district court, appellants' complaint alleged "that FRB made substantial advances to maintain Franklin's liquidity and permit uninsured depositors and general creditors to withdraw their funds from Franklin." Against this unusual theory of why the FRB was willing to stake well over a billion dollars on FNB's survival is the FRB's public explanation of May 12, 1974 that "(a)s a matter of general policy the Federal Reserve makes credit extensions to member banks, upon acceptable collateral so long as the honoring member bank is solvent." Two days prior to this statement, the FRB had been formally assured in writing of FNB's solvency by the Acting Comptroller of the Currency. In addition, appellants' own citation in their Brief to H.Rep. No. 94-1669 (Adequacy of The Office of The Comptroller of The Currency's Supervision of Franklin National Bank ), 94th Cong., 2d Sess. (1976), a report of an investigation by a subcommittee of the House Committee on Government Operations, makes clear that during the period when FRB was extending credit to FNB, the Comptroller directed his efforts towards finding a suitable merger partner for FNB in order thereby to avert the liquidity crisis. What emerges from these sources is the attempt by the FRB to save FNB from insolvency by affording the Comptroller valuable time to seek and find a solution which would preserve the maximum possible value of FNB's assets, and at the same time minimize the effects of an insolvency on the banking industry and the national economy. The FRB was specifically empowered to extend emergency credit to FNB through the Federal Reserve Board's Regulation A, 12 C.F.R. § 201.2, enacted pursuant to 12 U.S.C. § 301, and through 12 U.S.C. § 347b.[1]
 
 
 15
 Appellants argue that these advances, which in effect was throwing good money after bad, should not have been made, and they now ask this court to set aside these contributions.
 
 
 16
 Both the fixing of the date of declaration of insolvency by the Comptroller and the granting of rescue funds to FNB by the FRB were exercises of judgment by the public officials concerned and were well within their competence and authority. Absent clear evidence of grossly arbitrary or capricious action on the part of either or both of them a factor which does not appear to be present here it is not for the courts to say whether or not the actions taken were justified in the public interest, particularly where it vitally concerned the operation and stability of the nation's banking system. Such an adjudication would have to be made in the face of 12 C.F.R. § 201.2(e)'s specific authorization for emergency credit to member Federal Reserve banks in the light of "exceptional circumstances or practices involving only a particular member bank."
 
 
 17
 Moreover, the FRB's handling of this particular financial crisis comports with congressional purpose in approving the Federal Reserve Act itself. The House Committee on Banking and Currency's report on the Federal Reserve Act of 1913, H.Rep. No. 69 (Changes in the Banking and Currency System of the United States), 63rd Cong., 1st Sess. (1913), pointed out that one of the deficiencies of the then existing national banking system was a lack of adequate safeguards against "panics and commercial stringencies or any means of alleviating them," (id. at 6). Accordingly, one of the enumerated "ESSENTIAL FEATURES OF REFORM" was:
 
 
 18
 "(2) General economy of reserves in order that such reserves might be held ready for use in protecting the banks of any section of the country and for enabling them to go on meeting their obligations instead of suspending payments as so often in the past." Id. at 11.
 
 
 19
 In short, the FRB in the present situation was doing, for better or worse, what Congress expected it to do under the Federal Reserve Act.
 
 
 20
 What few precedents there are for this set of circumstances support the conclusion that appellants' tort claim against the FRB, arising from the advances, may not be adjudicated here. In Raichle v. Federal Reserve Bank, 34 F.2d 910 (2d Cir. 1929), this court affirmed the dismissal of an action against the FRB based on the bank's restriction of credit through increases in the rediscount rate pursuant to statutory authority. The complaint charged an arbitrary reduction in brokers' loans and a general reduction of security prices. 34 F.2d at 911. In dismissing the action for failure to join the members of the Federal Reserve Board (the issue of lack of jurisdiction was urged by the FRB, but not passed on by the Court of Appeals, 34 F.2d at 910), the court stated that nowhere in the complaint had the plaintiff alleged that the FRB's actions were in bad faith or engaged in with the intention of injuring the plaintiff. Moreover,
 
 
 21
 "(it) would be an unthinkable burden upon any banking system if its open market sales and discount rates were to be subject to judicial review. Indeed, the correction of discount rates by judicial decree seems almost grotesque, when we remember that conditions in the money market often change from hour to hour, and the disease would ordinarily be over long before a judicial diagnosis could be made." 34 F.2d at 915.
 
 
 22
 In Billings Utility Co. v. Advisory Committee, 135 F.2d 108 (8th Cir. 1943), the plaintiff had requested and been denied a $35,000 loan by the Federal Reserve Bank of Minneapolis. The court found that under the governing statute, the bank was permitted to make the loan, but not required to do so, 135 F.2d at 111, and that the conduct of the bank's officers was "subject only to the restrictions and limitations contained in the act and when they have acted within those limitations, their conduct is not subject to judicial review." Id. at 112. See also, Bryan v. Federal Open Market Committee, 235 F.Supp. 877 (D.Montana 1964) (dismissal for lack of standing, of an action challenging the powers of the Open Market Committee); Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975) (customers of a brokerage firm do not have an implied, private right of action to compel the Securities Investor Protection Corp. to grant its protection to a brokerage firm member the statute involved therein, 15 U.S.C. § 78eee(a)(2), provides that the Corporation "may" apply for a judicial decree adjudicating one of the members in need of the protections of the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa, et seq.). In short, the dismissal of appellants' first claim against the FRB was correct, but on the ground of lack of subject matter jurisdiction.
 
 
 23
 The appellants' second claim against the FRB, charging a preferential transfer of FNB assets to FDIC to the detriment of appellants as general creditors of FNB, must fail as well. The thrust of this claim is that the provisions of the October 8, 1974 Purchase and Assumption Agreement for the sale of FNB's assets, whereby assets retained by the FDIC as Receiver of FNB would be applied first to repaying FRB's $1.7 billion loan to FNB, were invalid in that FRB loaned those funds to FNB knowing of the insolvency or in contemplation thereof. If this allegation were factually correct, it would be contrary to 12 U.S.C. § 91, which voids bank transfers after the commission of an act of insolvency, or in contemplation thereof, with a view to the preference of one creditor over another. The district court was correct in holding that FRB is not a necessary party to this claim, because the same October 8, 1974 Purchase and Assumption Agreement that allegedly created the preferential transfer of FNB assets also provided for the release of FRB's lien to EAB with respect to the assets purchased by or transferred to it, and to FDIC as a corporation with respect to the remaining assets. FDIC thereafter became responsible for repaying the entire $1.7 billion FRB loan. If appellants' preferential transfer claims were meritorious, the proper party affected would be the FDIC and not the FRB.
 
 
 24
 With respect to the claims against the Comptroller, appellants' arguments for imposing liability on James E. Smith, individually and in his official capacity, are that: (1) he failed to declare an insolvent bank insolvent; (2) he declared an insolvent bank solvent; (3) he kept an insolvent bank open; (4) he consented to an unlawful preference among creditors in violation of 12 U.S.C. § 194; and (5) he failed to take action to have those preferential liens declared null and void. Insofar as the complaint seeks monetary damages against the Comptroller for acts or omissions in carrying out his official duties, this is a suit against the United States, which may not be maintained absent consent by the Government, Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963). The Federal Tort Claims Act, 28 U.S.C. § 2680(a), prohibits claims against the Federal Government which are based on "the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Under12 U.S.C. § 191, the Comptroller "may" appoint a receiver "whenever . . . (he) shall become satisfied of the insolvency of a national banking association . . . ." Needless to say, the process of determining the point at which a bank is no longer able to meet its obligations as they fall due involves a substantial amount of discretion. As the Supreme Court wrote in Dalehite v. United States, 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953), a suit under the Federal Tort Claims Act against the United States to recover for losses sustained as a result of explosions of fertilizer with an ammonium nitrate base at Texas City, Texas: "Where there is room for policy judgment and decision there is discretion."
 
 
 25
 Much the same analysis and conclusions apply to the claims against the Comptroller individually. It is well settled that federal officials are not personally liable for alleged torts based upon acts committed within the scope of their official duties requiring the exercise of judgment or discretion, Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959); Ove Gustavsson Contracting Co. v. Floete, 299 F.2d 655, 658 (2d Cir. 1962), cert. denied, 374 U.S. 827, 83 S.Ct. 1862, 10 L.Ed.2d 1050 (1963); Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). This court wrote in Ove Gustavsson Contracting Co. v. Floete, supra, that deciding whether the official in question has performed a discretionary act involves answering the question whether "the act complained of (is) the result of a judgment or decision which it is necessary that the Government official be free to make without fear or threat of vexatious or fictitious suits and alleged personal liability?" 299 F.2d at 659. In the present case, the answer to this question must be in the affirmative for sound reasons of policy.
 
 
 26
 Accordingly, the dismissal of the claims against the Comptroller is hereby affirmed.[2]
 
 
 27
 There are also claims against EAB, which took over a large portion of FNB's former banking business. As noted earlier in this opinion, the facts surrounding the cessation of credit to Huntington following FNB's insolvency were that Carey wanted EAB to advance $100,000 to Ikenson Iron Works, Inc., on behalf of Huntington in connection with the building of Huntington Towers II and to continue the financing of the building to its completion. A meeting of EAB representatives, Carey and Ikenson was held at the main office of EAB on October 18, 1974, 10 days after the declaration of FNB's insolvency. At this meeting, Ikenson was given an EAB check for $100,000, and Carey signed a note in the same amount payable to EAB. Assurances of continued financing were allegedly given at that meeting by Mr. Klaus Jacobs of EAB, but no new loan agreement providing for future advances was entered into between Huntington, Carey and EAB, and thereafter, there was no further financing on Huntington Towers II by EAB. The legal question which naturally arose from these facts was whether the New York Statute of Frauds, N.Y.G.O.L. § 5-703 (McKinney), voided the purported oral agreement by EAB for the continued financing of Huntington Towers II. The district court held that the Statute of Frauds was controlling and precluded appellants' recovery on their first cause of action for monetary damages resulting from the termination of the financing of their building.
 
 
 28
 N.Y.G.O.L. § 5-703(1) provides that an "estate or interest in real property . . . or any trust or power, over or concerning real property, or in any manner relating thereto, cannot be created . . . unless by act or operation of law or by a deed or conveyance in writing . . . ." New York case law applying this ancient rule, including Sleeth v. Sampson, 237 N.Y. 69, 142 N.E. 355 (1923), and Donahue v. Manufacturers Trust Co., 10 Misc.2d 298, 166 N.Y.S.2d 174 (Sup. Ct., Westchester Co. 1957), establishes that a contract to give a mortgage is a contract for the sale of an interest in real property. In the present case, paragraph 9 of the plaintiffs' complaint specified that the original, 1973 financing agreement between Huntington, Carey and FNB had provided for advances by FNB up to a total of five million dollars "against a commitment from a responsible lending institution to issue a permanent mortgage on the completed building in the said amount." In June of 1974, at FNB's request, appellants had provided FNB with additional security, consisting of "certain mortgages on unimproved real property including the real property hereinabove referred to (Huntington Towers II)." Appellants' complaint at P 11. Appellants' original arrangement with FNB was, for purposes of the New York Statute of Frauds, a contract in writing to give a mortgage. As for the purported second financing agreement, this time with EAB, appellants do not claim that its terms and provisions, including mortgage security provisions, were any different from those with FNB. Accordingly, it logically follows that this purported financing agreement with EAB was likewise governed by N.Y.G.O.L. § 5-703 as a contract to give a mortgage, and was, therefore, void because it was not in writing.
 
 
 29
 Appellants' argument on appeal that pursuant to 12 U.S.C. § 371, the purported financing by EAB of Huntington Towers II was a commercial loan and that this Federal statute takes the agreement in question out of the provisions of the New York Statute of Frauds is simply not persuasive. 12 U.S.C. § 371 authorizes national banks to make real estate and other types of loans, and specifies security requirements for various forms of financing. This federal statute does not purport to define real estate, or contracts to give a mortgage, or anything of the sort. It is inapplicable to this dispute and can in no way be said to preempt state law on the issue of whether the Statute of Frauds bears upon controversies such as the present case.[3]
 
 
 30
 Appellants further seek to escape the application of the Statute of Frauds through the equitable doctrine of part performance, N.Y.G.O.L. § 5-703(4). The alleged part performance was EAB's $100,000 advance to Ikenson Iron Works on behalf of Huntington. Significantly, appellants have not alleged the partial performance by themselves into which they entered in reliance upon the promise of EAB to the appellants' detriment. They concede, however, that the part performance doctrine has been qualified in New York through judicial interpretation in cases such as Burns v. McCormick, 233 N.Y. 230, 135 N.E. 273 (1922) and Wilson v. LaVan, 22 N.Y.2d 131, 291 N.Y.S.2d 344, 238 N.E.2d 738 (1968), which have held that the part performance in question
 
 
 31
 "must be performance 'unequivocally referable' to the agreement, performance which alone and without the aid of words or promise is unintelligible or at least extraordinary unless as an incident of ownership assured, if not existing." Burns v. McCormick, supra, 233 N.Y. at 232, 135 N.E. at 273.
 
 
 32
 Applying the above standard to the facts of this case, the district court was plainly correct in ruling that appellants could not avail themselves of the part performance doctrine. Although perhaps unknown to appellants at the time, EAB was allowed to select particular FNB assets for purchase pursuant to the October 8, 1974 Purchase and Assumption Agreement.
 
 
 33
 The dismissal of the first claim against EAB, based on its refusal to continue the financing of Huntington Towers II, is affirmed.
 
 
 34
 As to the appellants' second claim against EAB, the preferential transfer claim, the district court ruled that EAB was entitled to dismissal on the grounds that it was a bona fide purchaser of FNB assets. This conclusion followed from the court's findings that "EAB had received definite assurances of the validity of FDIC's sale" and that the EAB bid was a "competitive" one. On this appeal, appellants characterize the bona fide purchaser status of EAB as a "non-issue in the case." They argue that there was no basis below to support the bona fide purchaser defense on the grounds that EAB played an active role in structuring "the deal that it would ultimately bid on," which in turn gave rise to doubt about the arm's length nature of the bargain and thus, EAB's bona fide purchaser status. In addition, the Trustee in Bankruptcy of FNB, as Amicus Curiae, has submitted a short memorandum to this court arguing that the complex bona fide purchaser issue was "not explored in the papers filed with the district court . . ." and need not be reached to resolve the present issues.
 
 
 35
 The Trustee in Bankruptcy also urges that appellants' claim against EAB on the alleged preferential transfer, as well as EAB's defense of bona fide purchaser, is premature. We agree. This claim is premature because at this point the appellants have not yet established their claim against FNB. This status derives from their transmittal to FNB of collateral allegedly worth $3,000,000 in June of 1974 to secure further advances for the financing of Huntington Towers II.[4] Upon trial of their claims for a rescission against FNB (in liquidation) and EAB as assignee or (if EAB establishes its bona fide purchaser status) then against FDIC, appellants first have to establish their right to the ownership of the excess collateral over the debt for which it was pledged before they are entitled to the legal or equitable relief sought.
 
 
 36
 Appellants have alleged in their complaint that the sale to EAB was not to a bona fide purchaser but was fraudulent; they should be afforded the opportunity at the trial to prove this. Success in this effort, however, would not revive EAB's alleged agreement to continue the Huntington II financing, which we have ruled to be barred by the Statute of Frauds, but instead would give rise to a claim for damages resulting from EAB's fraudulent conduct.
 
 
 37
 While we agree that the preferential transfer claim is premature as against EAB, we reverse the district court's dismissal of this claim against EAB and order that it be tried along with the remaining claims against FNB (in liquidation) and FDIC, matters which are not presently before us on this appeal.
 
 
 38
 It is so ordered.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 The House Committee on Government Operations Report, H.Rep. No. 94-1669 (Adequacy of the Office of the Comptroller of the Currency's Supervision of Franklin National Bank ), 94th Cong., 2d Sess. (1976), criticized the soundness of FRB's advances on the ground that "it is a policy of the Federal Reserve in making such advances to first satisfy itself that repayment of the loan can be made without resort to the collateral. Notwithstanding this policy, the Federal Reserve Bank of New York loaned Franklin $1.7 billion, although it had reason to believe that Franklin itself would not be able to repay the loan." Id. at 6
 
 
 [2]
 Economou v. United States Department of Agriculture, 535 F.2d 688 (2d Cir. 1976), cert. granted, 429 U.S. 1089, 97 S.Ct. 1097, 51 L.Ed.2d 534 (1977), granting only a qualified immunity to certain executive officials of the federal government in an action brought under 42 U.S.C. § 1983, is not to the contrary. Economou sets forth broadly applicable standards governing the immunity available to executive officials. But the case contemplates examination of the discretionary function performed by the individual official and does not purport conclusively to bar the availability of absolute immunity, 535 F.2d at 696. Here the breadth and character of the discretion exercised by the Comptroller under 12 U.S.C. § 191 in declaring himself "satisfied" as to a bank's insolvency makes this a clear case calling for granting absolute immunity
 
 
 [3]
 Even were we to be persuaded that the New York Statute of Frauds should not be applied here, appellants have shown no more than preliminary negotiations between themselves and EAB, insufficient to constitute a binding oral agreement. The January 23, 1976 Affidavit of Seymour Ikenson of Ikenson Iron Works, Inc., who was present at the October 18, 1974 meeting between officials of EAB and appellant Carey, states that Mr. Klaus Jacobs of EAB told Ikenson at that time that, "We (EAB) intend to finance construction of the job (Huntington Towers II) because we have a commitment to Long Island . . . Nothing will change." The words, "Nothing will change," may be interpreted to mean that EAB would continue financing Huntington Towers II on the same terms as had FNB; it could, however, just as easily be interpreted to mean that the parties would meet at a future time to discuss the terms and conditions of EAB's continued financing. New York law is clear in holding that where " 'a material element of a contemplated contract is left for future negotiations, there is no contract enforcible under the statute of frauds or otherwise.' " Willmott v. Giarraputo, 5 N.Y.2d 250, 184 N.Y.S.2d 97, 98, 157 N.E.2d 282, 283 (1959). As Professor Corbin has correctly pointed out: "Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract." Corbin on Contracts, § 95 at 394 (1963 ed.) (citing cases in omitted footnote). To construct a complete and detailed financing agreement between appellants and EAB on Mr. Jacob's alleged "Nothing will change" statement goes against common sense and the time-honored maxim that "neither the court nor the jury can make an agreement for the parties." Thomson v. Gortner, 73 Md. 474, 21 A. 371 (1891)
 
 
 [4]
 The district court ruled that as to the $3,000,000 collateral, appellants may continue their case against the Receiver as a claim for "rescission." We agree and point out that appellants may recover that portion of their collateral in excess of their advancements and other indebtedness due by the pledgors to FNB