FAIRCHILD, ARABATZIS & SMITH,
INC. and Steven M. Arabatzis,
Plaintiffs,

v.

Michael SACKHEIM, Bernard Prince and
Commodity Futures Trading
Commission, Defendants.

No. 78 Civ. 435.

United States District Court,
S. D. New York.

June 27, 1978.

As Amended July 27, 1978.

David C. Buxbaum, P. C., New York City, for plaintiffs; David C. Buxbaum, George Karl Rosenstock, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., S. D. New York, New York City, for defendants Michael Sackheim and Bernard Prince; William Hibsher, Asst. U. S. Atty., New York City, of counsel.

LASKER, District Judge.

This memorandum takes up issues left open in our earlier opinion, *Fairchild, Arabatzis & Smith, Inc. v. Sackheim*, 451 F.Supp. 1181 (April 28, 1978): (1) whether allegations that the individual defendants were implicated in a malign, even criminal, investigation, state a claim under federal law and (2) whether the individuals, agents of the Commodity Futures Trading Commission ("Commission"), are liable in damages for such a claim. *Id.*, at 1192 n. 6. These issues are now clearly framed by the agents' motion,[1] pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, or, in the alternative, Rule 56(b), for an order dismissing the complaint insofar as it seeks monetary relief.

In support of the motion, the defendants, Michael Sackheim ("Sackheim") and Bernard Prince ("Prince"), argue that the allegations against them are fatally conclusory; that in any event, they do not rise to the

level of constitutional grievances; that if they do, damages are not available for the constitutional injuries claimed; and, finally, that even if damages were recoverable under the constitutional provisions invoked, the agents are shielded from liability by official immunity. We find that as to those allegations which do state a claim under the United States Constitution (some do not, see *infra*, at 1185–1186) the defendants are entitled to summary judgment, since they have established an immunity defense to an action for damages. Moreover, defendants' papers demonstrate that although plaintiffs state some claims under the Constitution, they are not entitled to prevail, either for the purpose of collecting damages or for the purpose of obtaining equitable relief. In short, the unopposed affidavits of Sackheim, Prince, and Leslie Blau show that plaintiffs have failed to raise a genuine issue as to the existence of a constitutional injury and that the best case plaintiffs can prove is a claim of common law tort.

Our findings, which dispose of the constitutional allegations either under Rule 12(b)(6) or Rule 56(b), remove the only valid jurisdictional basis of the complaint, 28 U.S.C. § 1331.[2] There being no federal question presented by the complaint, it is now dismissed in its entirety.

The complaint against the individuals arises from the following, alleged set of events. In December, 1977, Prince, a futures trading specialist with the enforcement division of the Commission, visited the offices of Fairchild, Arabatzis & Smith, Inc. ("FAS"). The ostensible purpose of the visit was "to determine and inspect the

---

**1.** Initially, all the defendants were represented by the Commission, whose earlier motion to dismiss (see *Fairchild, Arabatzis & Smith, Inc. v. Sackheim, supra,* 451 F.Supp. 1183) did not challenge the demand for damages from the agents. After our ruling on the first motion, the United States Attorney received authorization to represent the individual defendants and briefed the questions that are the subject of this opinion.

**2.** Although a variety of alternative jurisdictional predicates is alleged ("3, Complaint), none of them is adequate. As for the First and Fifth

Amendments to the United States Constitution, 7 U.S.C. § 2 *et seq.*, and 18 U.S.C. § 201, none of these is jurisdictional. 15 U.S.C. § 26 confers judicial power in cases arising under the anti-trust laws. It has no conceivable application to the present case. Finally, although 5 U.S.C. § 702 might be read as providing for jurisdiction in cases of injury suffered because of agency action, no such "action," as that term is used in § 702, is alleged. See 5 U.S.C. § 551(13); *Fairchild, Arabatzis & Smith, Inc. v. Sackheim, supra,* 451 F.Supp. at 1187.

registration of ['FAS'] employees." ·(¶ 11, Complaint) In the course of his inspection, Prince harassed FAS personnel by demanding information, snatching documents from people, and screaming at an FAS associate. On a second visit to FAS, Prince interrupted a Christmas party by demanding additional information and documents.

FAS expressed its dissatisfaction with Prince's rude conduct by having its attorney place a call to the Commission on December 23rd. The call was received by Blau, acting regional counsel for the New York office of the enforcement division, and defendant Sackheim, an attorney in that office. In the course of the ensuing conversation, Sackheim made a sarcastic remark, impugning the integrity of FAS' business operations. The added sting of Sackheim's misbehavior prompted a letter from FAS to the Commission, in which FAS' counsel complained of Prince's and Sackheim's misconduct.

Three weeks later, in January, 1978, FAS was served with three subpoenas duces tecum, issued by the Commission, and learned that it was the subject of a formal Commission investigation. After the formal investigation began, the defendants committed the indiscretion of announcing the pendency of the investigation to "members of the public," and of making another disparaging remark about FAS (see ¶ 35, Complaint: "defendants . . . also informed members of the public that FAS ordinarily did not return funds to the public").

These factual allegations have been clothed, rather awkwardly, in motley legal dressing. Prince's conduct on the two site visits is claimed to constitute a "taking of plaintiffs' business without due process of law" (sic) (¶ 37, Complaint. See, also, *id.*, at ¶ 15) in violation of the Fifth Amendment, as well as an "interference in plaintiff's employees' freedom of expression and freedom of movement," (¶ 15, Complaint), presumably in violation of the First Amendment.

The institution of the formal investigation is also characterized as violating various legal rights. Said to be a retaliation for FAS' criticism of the agents' offensive behavior, the issuance of a formal order of investigation—in which Prince and Sackheim are allegedly implicated—is charged as a violation of plaintiffs' rights under the First Amendment. It is also claimed to be, in some unspecified way, a "taking of plaintiffs' business without due process of law," as well as a selective, discriminatory enforcement of the Commission's enabling law, 7 U.S.C. § 2 *et seq.* (Supp. IV, 1974), in violation of the Fifth Amendment's due process clause. Finally, commencement of the investigation is described as part of a criminal conspiracy, in which Sackheim and Prince attempted to extort payment from FAS (¶¶ 20, 36, 43, Complaint; see, also, *id.*, at ¶ 3; ¶¶ 25–34 Arabatzis Reply Affidavit, February 22, 1978).

As for the public pronouncements concerning the fact that FAS was under investigation and the remarks on FAS' operating methods, these are claimed to be a constitutionally defective "taking" (¶ 37, Complaint).[3]

\* \* \* \* \* \*

*Vagueness*

■ While the complaint could have been drafted with considerably more clarity, it cannot be said that the claims of constitutional deprivation are so vaguely pleaded that the defendants are unable intelligently to answer the charges against them. On the contrary, the factual basis of the claims is provided in the complaint, where specific instances of alleged misconduct are identified and tied to the alleged conspiracy. To the extent that the pleading omits crucial details of the claims, those are supplied by

---

**3.** The factual allegations recited above are also pleaded as state law claims (see ¶¶ 39–41, Complaint). Because the federal claims are disposed of either by motion to dismiss or by motion for summary judgment, there is nothing to which the state law claims may attach under the doctrine of pendent jurisdiction. Therefore, they are dismissed. See *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Arabatzis' reply affidavit.[4] Plaintiffs' allegations are sufficiently clear that both defendants have been able to submit two affidavits rebutting the charges lodged against them (Prince Affidavits, February 13 and April 28, 1978; Sackheim Affidavits, February 13 and May 1, 1978). In sum, plaintiffs have complied with the standard of specificity required, in this Circuit, of complaints involving deprivation of or conspiracies to deprive persons of constitutional rights. *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977); *Jacobson v. Organized Crime and Racketeering Section of the United States Department of Justice*, 544 F.2d 637, 639 (2d Cir. 1976), *cert. denied*, 430 U.S. 955, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977); *Black v. United States*, 534 F.2d 524, 528 (2d Cir. 1976).[5]

*Prince's Offensive Conduct*

 How Prince's belligerent conduct, "demanding," "screaming," and "snatching," rises to the level of constitutional injury (affecting plaintiffs' First and Fifth Amendment rights) is a mystery that the plaintiffs have made no effort to illuminate. Whatever legal characterizations might be urged, Prince's acts were, at worst, common law torts, which are said to have been committed against others than the plaintiffs. Putting aside the serious question whether FAS and Arabatzis have standing to raise claims arising from Prince's mistreatment of others,[6] we think that casting the claims as constitutional violations is inappropriate. The accused verbal acts, screams and demands, are not even sufficient to state a claim for assault. Though the classic definition of that tort encompasses "[a]ny act of such nature as to excite an apprehension of battery," Prosser, Torts, § 10 at 38 (4th ed. 1971), quoted with approval in *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973) "[e]ven at common law 'mere words, however violent, are held not to amount to an assault.'" *Johnson v. Glick, supra*, 481 F.2d at 1033 n. 7, quoting Prosser, Torts, *supra*, § 10 at 39. As for the charge that Prince snatched documents from the hands of an FAS employee (see ¶ 13c, Arabatzis Affidavit, January 31, 1978), it is true that use of undue force by a federal official might, under some circumstances, amount to a deprivation of liberty without due process of law. *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *Johnson v. Glick, supra*, 481 F.2d at 1032; *accord, Jones v. Marshall*, 528 F.2d 132, 139 (2d Cir. 1975). However, the "constitutional protection [against the use of force] is nowhere nearly so extensive as that afforded by the common law tort action for battery, which makes actionable any intentional and unpermitted contact with the plaintiff's person or anything attached to it and practically identified with it . . . ." *Johnson v. Glick, supra*, 481 F.2d at 1033. Prince's snatching of documents is not to be condoned—there is no

---

4. The agents' attorney correctly observes that there is no specific allegation against Sackheim except for the alleged sarcastic remark. However, Sackheim is charged with participating in the conspiracy to punish FAS for its criticism and to extort money from it (¶ 43, Complaint. See *id.*, at ¶¶ 37, 38). Although Sackheim's complicity in the scheme is pleaded in a conclusory manner, the scheme itself is not. There is a factual basis—albeit circumstantial—for the claims of evil design and, taken together with the naked charge that Sackheim was a culpable participant, they sufficiently notify him of the case against him.

5. See *Powell v. Workmen's Compensation Board*, 327 F.2d 131, 137 (2d Cir. 1964) (complaints alleging conspiracy to violate civil rights must "allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy."); and see *Koch v. Yunich*, 533 F.2d 80, 85 (2d Cir. 1976); *Fine v. City of New York*, 529 F.2d 70, 73 (2d Cir. 1975); *Powell v. Jarvis*, 460 F.2d 551, 553 (2d Cir. 1972); *Morpurgo v. Board of Education in City of New York*, 423 F.Supp. 704, 713 (S.D.N.Y.1976).

6. Though neither side has briefed the point, the rights accorded victims of batteries or assaults would appear to be personal. If they are, they cannot be asserted by third parties. *Cf., Tileston v. Ullman*, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). It could be argued that insofar as torts committed against corporate employees interfere with the corporation's business, it has standing to complain of them. The plaintiffs have not made this argument.

reason why federal agents cannot perform their investigations coolly—however, to the extent that the behavior is actionable, it is so because it is a battery; and to the extent that it is a battery, it is the mildest sort, involving no offense to the actual body of the person. Certainly, the acts cannot be said to constitute "conduct that shocks the conscience," *Rochin v. California, supra,* 342 U.S. at 172, 72 S.Ct. 205; *Johnson v. Glick, supra,* 481 F.2d at 1033, actionable directly under the Constitution. Failing that test, Prince's misbehavior in the field does not state a federally cognizable claim.

*Wrongful Commencement of an Investigation/Public Disparagement*

 There is no need to dwell at length on deciphering plaintiffs' cryptic reading and application of the Fifth Amendment, under which they assert that "defendants' wrongful acts in commencing an investigation of plaintiff FAS for reasons of spite, and defendants' pronouncements to the public about the dubious activities of plaintiff FAS are a taking of plaintiffs' business without due process of law . . . ." (¶ 37, Complaint). Neither is it necessary to puzzle over the invocation of 18 U.S.C. § 201, a penal statute that affords no private relief. Plaintiffs' attack on the investigation and on the defendants' public disparagement of FAS (¶ 35, Complaint) is federally cognizable under less exotic theories of constitutional law. It is claimed that both the order of investigation, which came on the heels of FAS' criticism of the Commission, and defendants' derogatory remarks, were retaliatory. Such retaliation, if proven, would be a restriction of plaintiffs' "freedom to exercise [their] constitutional rights . . . to criticize [their] government," *Economou v. United States Department of Agriculture,* 535 F.2d 688, 694 (2d Cir. 1976), *cert. granted,* 429 U.S. 1089, 97 S.Ct. 1097, 51 L.Ed.2d 534 (1977), actionable under the First, and possibly the Fifth, Amendment. Furthermore, the use of the facially neutral enforcement provisions of the Commodity Exchange Act, 7

U.S.C. § 2 *et seq.,* as an instrument of retaliation necessarily involves a discriminatory "singling out," offensive to the guarantee of equal protection of the laws. *Cf., Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed.2d 220 (1886). That offense gives rise to a claim under the Fifth Amendment, whose due process clause embraces the concept of equal protection. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Delaware Tribal Business Committee v. Weeks,* 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977).

\* \* \* \* \* \*

 With the continuing silence in this Circuit on the question whether the rationale of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) has been extended to permit monetary recovery for violations of rights protected by amendments other than the Fourth and the Fourteenth, see *Turpin v. Mailet,* 579 F.2d 152 (2d Cir. 1978) (en banc), it remains uncertain whether proof of plaintiffs' First and Fifth Amendment claims would entitle them to damages. Even if damages potentially were available, however, we conclude that the agents are entitled to assert, as they have done, a defense of qualified, official immunity. See *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Economou v. United States Department of Agriculture, supra,* 535 F.2d 688, and that they have established an uncontested factual basis for their claim of immunity. Accordingly, on the question of monetary recovery against the agents, there is no genuine issue of material fact.

*Official Immunity From Damages*

Sackheim and Prince contend that they are absolutely immune from damage liability because the accused acts were within the scope of their official powers.[7] They cite

7. On the theory that the agents' authority does not give them license to violate the Constitu-

tion, plaintiffs argue that the acts alleged were not within the scope of official power and that

*Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) in support of their claim of unconditional protection. Reliance on *Barr* is misplaced, if only for the reason that that case did not involve allegations of deprivation of constitutional rights by government officials. Moreover, the Supreme Court has recently extensively refined the theory of official immunity. See *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Wood v. Strickland, supra,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214; *Scheuer v. Rhodes, supra,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90; *Pierson v. Ray, supra,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288. With regard to officials of the executive branch of government, the trend of the recent line of cases has been a refusal to extend ". . . *absolute* immunity . . . in the absence of the most convincing showing that the immunity is necessary." *Imbler v. Pachtman, supra,* 424 U.S. at 434, 96 S.Ct. at 997 (White, J., concurring) (emphasis in original). In general, the level of immunity granted has been determined by reference to the central purpose behind the grant of immunity, which is to permit unembarrassed exercise of official power, freed from "harassment by unfounded litigation . . ." *Imbler v. Pachtman, supra,* 424 U.S. at 423, 96 S.Ct. 984. To this end, the Supreme Court has fashioned a test that fits the degree of immunity to the range of authority and discretion exercised by the executive official and to the circumstances under which he or she is called upon to exercise official power:

> "[I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Scheuer v. Rhodes, supra,* 416 U.S. at 247–8, 94 S.Ct. at 1692.

*Scheuer* involved a challenge to actions taken by, among others, the governor of Ohio, in connection with the incident at Kent State University. Notwithstanding the Court's observation that high executive officials must frequently exercise a discretion whose range is "virtually infinite," in circumstances requiring prompt action based on uncertain information, the Court nevertheless found that a qualified immunity was sufficient to prevent executive paralysis. Certainly, the investigative officers involved in the present case are entitled to no more immunity than was accorded Governor Rhodes. They operate within a considerably narrower band of discretion than does a chief executive officer and there has been no claim—nor could there be—that

---

therefore the defense of immunity is unavailable. "Within the scope" is a term of art; it signifies merely that the accused conduct is, on its face (that is, viewed apart from the underlying motivation of the actor), the sort that the official is empowered to perform. If it is, the act is not removed from the scope by evil motive:

> "The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating

the whole doctrine. *What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him . . ."* *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir. 1949) (emphasis supplied); quoted with approval in *Barr v. Matteo,* 360 U.S. 564, 572, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

The immunity defense is available in this case because the commencement and conduct of an investigation—the acts from which the complaint arises—are activities in which agents of the Commission's enforcement division may properly engage and, therefore, are within the scope of their official conduct.

their investigative duties presented exigent circumstances involving "serious constraints of time and even information." *Imbler v. Pachtman, supra,* 424 U.S. at 425, 96 S.Ct. at 992. We conclude, therefore, that these agents, alleged to have committed wrongs in connection with the commencement and conduct of an administrative investigation, are adequately protected in the performance of their duties by a "qualified, 'good faith, reasonable grounds' immunity of the type approved by the Supreme Court in *Scheuer* and *Wood*." *Economou v. United States Department of Agriculture, supra,* 535 F.2d at 696.[8]

■ Applying that standard to this case, Prince's and Sackheim's liability for damages depends on whether they had reasonable grounds for instituting the accused investigation and whether they conducted it in good faith, or whether they abused their official power by employing the investigative authority vested in them as an instrument of retaliation and personal gain. Prince and Sackheim have submitted affidavits explaining the actions they took, and their submissions demonstrate good faith and reasonableness. Plaintiffs, having failed "to respond under oath with 'specific facts showing that there is a genuine issue for trial' regarding the defendants' good faith or the existence of reasonable grounds for their action, summary judgment dismissing the complaint . . ." for damages is appropriate. *Economou v. United States Department of Agriculture, supra,* 535 F.2d at 696. On the strength of defendants' affidavits, we are able to conclude not merely that the plaintiffs are not entitled to damage relief, but that they are also precluded from obtaining equitable relief: the defendants have established, by affidavits that are unopposed in any relevant

detail, that their conduct was not violative of plaintiffs' constitutional rights.

*The History of the Investigation*

The central contention of the plaintiffs, indeed the only one sufficient for the invocation of federal question jurisdiction, 28 U.S.C. § 1331, is that the investigation of FAS was part of a constitutionally malignant and retaliatory scheme. This contention is conclusively rebutted by the affidavits of Sackheim, Prince and Blau. Blau, formerly in charge of the New York Region's enforcement division, supervised the investigation of FAS (¶ 1, Blau Affidavit, May 1, 1978). In the autumn of 1977, he issued the directive for the initial investigation of FAS (*id.*, at ¶¶ 3, 4), which gave rise to Prince's two site visits. The decision to look into FAS' affairs was prompted by the receipt of complaints from a number of FAS customers, concerning

> "serious fraudulent sales practices and unauthorized trading by FAS. These FAS customer complaints had been received by the Better Business Bureau of Metropolitan New York, the CFTC Washington, D.C. 'Hot-Line,' various CFTC regional offices, and from other government agencies." (*Id.*, at ¶ 3; ¶ 2, Sackheim Affidavit, February 13, 1978).

As for the commencement of the formal investigation, claimed to have been part of a conspiracy to punish FAS for its outspoken criticism of the Commission, the events leading to the issuance of a formal order began well before FAS lodged its complaint. Blau, after reviewing the affidavits submitted by complaining customers and consulting with Sackheim, perceived a need for subpoena power. He instructed Sackheim to "prepare the necessary papers for

---

**8.** The conclusion and the analysis leading up to it are consistent with *Huntington Towers, Ltd. v. Franklin National Bank*, 559 F.2d 863 (2d Cir. 1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978). That case involved a decision by the Comptroller of Currency, an executive official of rank considerably higher than the defendant agents, to declare a bank insolvent. The decision was made under a grant of broad discretion, and plaintiff's attack

on it did not allege any constitutional violations. In determining the proper measure of immunity, the court recognized and followed the analysis outlined in *Economou, supra,* 535 F.2d 688. On the basis of its "examination of the discretionary function [he] performed," 559 F.2d at 870 n. 2, the *Huntington* court concluded that the Comptroller enjoyed absolute immunity.

the Commission to issue a formal order of investigation." (¶ 5, Blau Affidavit) (The Commission must authorize the use of subpoenas. 17 C.F.R. § 11.4.) Sackheim forwarded the papers to the Commission in Washington, D.C. on December 6, 1977, (¶ 5, Blau Affidavit) well before FAS complained on December 23rd. Prince had nothing to do with the recommendation of a formal order (¶ 8, Prince Affidavit, April 28, 1978), which was issued on January 17, 1978 (Exhibit A, Sackheim Affidavit, February 13, 1978).

The chronology described above clearly refutes the "retaliation" charge; the basis for the investigation, both in its formal and informal phases, is revealed as *bona fide*, not malicious or criminal.[9] The affidavits submitted by plaintiffs in opposition to the instant motion contain nothing that raises an issue of fact regarding the history or purpose of the Commission's probe.

We come finally to the allegation that defendants publicly disparaged FAS:

" . . . subsequent to the letter of plaintiffs' counsel to the defendants dated January 25, 1978, defendants . . . announced to members of the public that FAS is under investigation and defendants have, on information and belief, also informed members of the public that FAS ordinarily did not return funds to the public." (¶ 35, Complaint).

As indicated earlier, these remarks were elevated to the status of constitutional violations on the theory that they were part of an unlawful conspiracy, whose foundation

was the institution of a retributive investigation. But the preceding discussion explodes the allegation that there was any conspiracy to violate the plaintiffs' constitutional rights. The accused investigation was commenced in good faith, in response to numerous customer complaints concerning FAS' business practices.

■ Moreover, the allegation in the complaint is misleading, to say the least. The announcement "to members of the public" occurred when Robert Feuillebois, an FAS employee, placed a telephone call to Prince on January 17 or 18, 1978. Feuillebois, posing[10] as a customer of FAS, told Prince that he had read reports that commodities trading merchants were under investigation, and he expressed concern about the wisdom of his own investment:

"CALLER: . . . [regarding] Fairchild, Arabatzis and Smith.

PRINCE: Right.

CALLER: And I, uh, saw some adverse publicity today in the London Times.

PRINCE: Right.

CALLER: And, uh, and in the Los Angeles Times.

PRINCE: Right.

CALLER: And, uh, I'm interested to find out if, uh, if I'm doing the right thing or not doing the right thing.

PRINCE: That I can't tell you. It's your money and you make your choice.

CALLER: I—I understand that; I understand that, but, uh, my question was the—there was a—an article which stipulated there was something like

---

9. As indicated above, the extortion charge does not state a claim for civil relief. However, it deserves discussion, since it involves a serious attack on the agents' reputation. The extortion claim is based on FAS' receipt of three threatening letters, which were received during the period spanned by Prince's site visits and the issuance of a formal order of investigation. The letters are anonymous. In an affidavit submitted prior to the current motion, Arabatzis charged Prince and Sackheim with the authorship of the letters (¶¶ 25–34, Arabatzis Reply Affidavit) though his attribution was based on the sheerest conjecture. Now, Prince and Sackheim have simply, categorically denied writing the letters (¶ 3, Prince Affidavit, April 28, 1978; ¶¶ 2, 3, Sackheim Affidavit, May 1,

1978), and the plaintiffs have not offered any contesting affidavits. In light of the agents' unrebutted denial, the earlier, unsubstantiated—even irresponsible—charge fails to raise an issue of fact.

10. In an administrative complaint filed by the Commission on June 7, 1978, it is alleged that Feuillebois has twice been convicted of felonies: (1) conspiracy to violate 18 U.S.C. § 656 ("Theft, embezzlement, or misapplication by bank officer or employee") and (2) grand larceny in the second degree. See ¶¶ 14, 15, Complaint filed in *In the Matter of Fairchild, Arabatzis and Smith, Inc., Steven M. Arabatzis and Robert F. Feuillebois*, CFTC Docket N. 78–52.

twenty-six or twenty-eight, uh, companies that are under investigation—

PRINCE: Right.

CALLER: And, uh, they said that, uh, there was thirty-eight of them altogether—

PRINCE: Right.

CALLER: And I wanted to make sure that I was was not doing business with one of the companies that's under investigation.

PRINCE: *Yeah. Well, they are one of the companies under investigation.* [emphasis supplied]

CALLER: They are under investigation.

PRINCE: Yes.

CALLER: I see. Okay. My—my problem now is, of course—uh—I know you can't make a decision for me and the problem, of course, is: Are they doing business the way they are supposed to be doing business, or—

PRINCE: That I can't tell you.

\* \* \* [Discussion in which the "caller" gave details of his transaction with FAS] \* \* \*

CALLER: But if you tell me they're under investigation, then, you know, uh, I don't know what I'm going to do. Maybe I'll call 'em up and tell 'em to, you know, cancel it or whatever, give me my money back.

PRINCE: Yeah. Was it—Whose check was it?

CALLER: It's a wire.

PRINCE: So, it was a wire.

CALLER: Yeah.

PRINCE: From a bank.

CALLER: Yes, sir.

PRINCE: You can't stop that.

CALLER: No. Well, I can't stop the transaction, but I can certainly call them, I'm sure, uh, to tell them I'm not interested and I want my money back. Right?

PRINCE: *You could do that, but I doubt you'll get it.* [emphasis supplied]

CALLER: Oh, okay. Alright.

PRINCE: This, I'm just being very frank with you.

CALLER: Okay. *Is this, is this normally done that they don't give money back?* [emphasis supplied]

PRINCE: *Yes.* [emphasis supplied]

CALLER: I see. Okay. Alright.

PRINCE: They don't give it back. [emphasis supplied] (sic)

CALLER: I see."

(Feuillebois Affidavit of March 6, 1978, at 2, 3, 6).

Plaintiffs have not alleged that Prince's disclosures violate any federal statute. There is a remote possibility that they could be perceived as defamatory, but it is difficult to see how: the remark about the pending investigation was true and Prince's expressed doubts about refunds, though conceivably capable of a derogatory interpretation, appears to have been an innocuous statement about the custom of the options trade, that customers' money is not refunded after a transaction is completed. In any event, it is unnecessary to decide whether the statements were defamatory since mere defamation by a public official is not actionable under the Constitution. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1975).

\* \* \* \* \* \*

In sum, our examination of the pleading and of the affidavits establishes that with regard to those allegations that state a claim under the Constitution, plaintiffs have failed to raise a genuine issue of material fact. Jurisdiction having been invoked under 28 U.S.C. § 1331, our finding compels dismissal of the complaint against the individuals, both in its injunctive and damage aspects.

The complaint is dismissed in its entirety.

It is so ordered.[11]

11. It would be possible to defer final dismissal pending possible submission by the plaintiffs of further affidavits to contest the Commission's denials. However, in our view, the irresponsibility of the charges made to date is such as to lead us to believe that such a procedure would be futile and wasteful.